FILED

Peter H. Bresnan
Russell D. Duncan
Cheryl J. Scarboro
Brent Mitchell

05 SEP 22 AM 11: 05

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO. FLORIDA

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4631
(tel) 202/551-4904 (Duncan)
(fax) 202/772-9233 (Duncan)

6:05-cv-1391-Orl-31KRS

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA

- - - - - - - - - - - - - - - - - - - x
                                       )
SECURITIES AND EXCHANGE COMMISSION,    )        **COMPLAINT**
                                       )
                        Plaintiff,     )        Injunctive
             v.                        )        Relief Sought
                                       )
                                       )        Jury Demand
ARMAND DAUPLAISE and BERNARD SHINDER   )
                                       )        05 Civ.
                        Defendants.    )
                                       )
- - - - - - - - - - - - - - - - - - - x

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

## NATURE OF THE ACTION

1.   The SEC brings this fraud action against two Bio One Corporation executives Armand Dauplaise and Bernard Shinder because of their attempt to conceal that Bio One had defaulted on a $15 million (Canadian) note and that they had signed two forbearance agreements to forestall the collapse of their company.

2.    Bio One acquired a series of private companies in
2003 and 2004 as part of its purported plan to "vertically
integrate" the vitamin/supplement business.  To purchase a
Canadian company, Interactive Nutrition International
("INI"), Bio One gave a $15 million (Canadian) note to the
company's former owners that required monthly payments
starting on July 1, 2004.

3.    Bio One never made a single payment on the $15
million (Canadian) note.  Bio One's CEO Dauplaise and its
CFO Shinder signed forbearance agreements in August and
November 2004, conceding the default and agreeing to limits
on Bio One's operations.  Yet, they failed to disclose the
defaults or the agreements in any filing with the
Commission or any other public statement, even withholding
them from the accountants and attorneys who prepared the
company's periodic filings.

4.    In December 2004, INI's former owners appointed a
receiver who changed INI's locks and seized its banks
accounts.  This effectively removed the manufacturing
center from Bio One's business plan.  Still, Dauplaise and
Shinder withheld that information from Bio One's directors
and lawyers, and they improperly convinced the company's
accountant to remove the word "default" from a Form 8-K
filed on December 23, 2004 with the Commission.

5.    Between July and December 2004, the company filed
two quarterly reports on August 18, 2004 and November 15,

2004 in which Bio One failed to disclose these issues. Similarly, on December 23, 2004, Bio One filed a Form 8-K that failed to disclose them. As a result, the public did not know about Bio One's default, the forbearance agreements, or the receivership and had an incomplete, incorrect view of Bio One's circumstances until the issues were disclosed in February 2005.

6. During 2004, Bio One sold more than 100 million shares of stock. When the issue became public, Bio One fired both Dauplaise and Shinder. The company has since ceased operations.

## JURISDICTION

7. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce and/or of the mails in connection with the transactions described in this Complaint.

## DEFENDANTS

8. **Armand Dauplaise** ("Dauplaise"), age 65, was the CEO and a director of Bio One. He earned $240,000 a year as the CEO. The Bio One board fired Dauplaise on February 18, 2005, and Dauplaise resigned as a director on February 22, 2005. Upon information and belief, Dauplaise is

currently the chairman of the board of directors of another
public company, Omni Alliance Group Inc.

9.  **Bernard Shinder** ("Shinder"), age 69, was a
director of Bio One from December 2003 to November 2004 and
held himself out as its CFO since 2002.  He earned $120,000
a year as a consultant to Bio One and served as a director
of Bio One's Interactive Nutrition International
subsidiary.  The Bio One board terminated its relationship
with Shinder on February 18, 2005.

10.  Bio One paid Shinder by hiring Bernard Shinder
Consultants Inc. ("Shinder Consultants"), a private
corporation whose only employees are Shinder, the
president, and his wife Adele, the chief accountant.
Shinder currently works for Shinder Consultants.

11.  Shinder acted on behalf of Shinder Consultants
when he worked for Bio One.  Shinder Consultants was paid
by Bio One for Shinder's work for Bio One.

### ISSUER

12.  **Bio One Corporation** ("Bio One") was a Nevada
corporation with a headquarters near Orlando, Florida.  The
common stock of Bio One is registered pursuant to Section
12(g) of the Exchange Act, and its shares traded on the
Over The Counter Bulletin Board until the company was
delisted in May 2005.

13.   Bio One filed an amended registration statement on May 6, 2004 that was declared effective on May 11, 2004.

14.   The Securities & Exchange Commission issued an order on December 16, 2004 that suspended the effectiveness of Bio One's May 6, 2004 registration statement.

15.   Simultaneous with the filing of this complaint, the Securities & Exchange Commission issued an order that revoked the registration of Bio One's securities.

### BIO ONE'S EXPANSION

**A.   BIO ONE'S ACQUISITIONS**

16.   Bio One was a shell company until September 2003 when it began acquiring private businesses.

17.   Bio One had become a public company through a reverse merger.  The company negotiated funding from Cornell Capital Partners ("CCP"), a New Jersey hedge fund that agreed to an "equity line" in which Bio One could obtain cash in return for stock that CCP would sell into the public market.

18.   Using money from CCP, Bio One aggressively began acquiring and starting private companies.  In early 2004, Bio One made three substantial purchases:

   a. On February 4, 2004, Bio One paid $1 million to acquire 80% of the stock of American Nutritional Exchange ("ANE").

b. On March 31, 2004, Bio One paid $23.4 million to acquire 100% of the stock of Interactive Nutrition Int'l. ("INI").

c. On April 5, 2004, Bio One paid $2 million along with 2 million shares of preferred stock to acquire 51% of the stock of Weifang Shengtai ("Shengtai").

19.   INI was a Canadian company in Ottawa that manufactured products, including nutrition bars.  Shinder has said that INI was the "cornerstone" of Bio One's business strategy because INI would manufacture products for its other subsidiaries to sell.  Dauplaise has said INI was central to the entire Bio One business plan, and he never considered pursuing the plan without it.

20.   INI contributed at least 25% of Bio One's revenues during the second and third quarters of 2004.  Bio One's only other manufacturing capacity was Shengtai's glucose factory in China.

21.   As part of the purchase, Bio One and INI issued a $15 million (Canadian) note to INI's former owners, the Nesrallah family.  The Nesrallahs remained as INI's management and held the note through a corporation now called Nesracorp.  Bio One agreed to start monthly payments of $263,158 (Canadian) on July 1, 2004.

**B.   BIO ONE DEFAULTS ON THE $15 MILLION (CANADIAN) NOTE**

22.   Bio One never made any monthly payment on the $15 million (Canadian) promissory note.  Under the terms of the note, the Nesrallah family held a security interest in INI's assets that it could enforce in the case of default. The note said that default occurred, inter alia, if an installment remained unpaid for 15 days following the receipt of a notice of default.  In the event of a default, the entire debt became due.

23.   On July 7, 2004, after Bio One missed the July 1, 2004 payment, Pam Nesrallah sent a letter to Dauplaise and Shinder saying that Bio One was in default.  The letter proposed that Nesracorp negotiate a forbearance agreement. The letter says "you are in default under the terms of the Note."

24.   Dauplaise received and signed a copy of the July 7, 2004 letter.

25.   Shinder and Dauplaise have claimed that Bio One was not required to make the July 2004 payment because the Nesrallahs had exaggerated INI's inventory and accounts receivable.  A reduced inventory or accounts receivable would have reduced the money due to the Nesrallah family in which case Dauplaise and Shinder claimed that Bio One could "set-off" the monthly payments.

7

26.   However, the accountant who discovered this "set-off" issue during an audit of INI said that he did not receive the INI documents from Canada until at least several days after July 6, 2004.   In addition, Dauplaise and Shinder both admit that they never mentioned the "set-off issue" to the Nesrallah family until after the Nesrallahs appointed a receiver in December 2004.

**C.    DAUPLAISE AND SHINDER SIGN TWO FORBEARANCE AGREEMENTS, BUT OMIT ANY DISCLOSURE IN TWO QUARTERLY FILINGS**

27.   On or about August 13, 2004, Pam Nesrallah sent a forbearance agreement (the "August Forbearance Agreement") to Dauplaise and Shinder.   The letter stated "you remain in default under the Promissory Note."

28.   The August Forbearance Agreement required Bio One, in part:

- to acknowledge the default and agree that the Nesrallahs were entitled to enforce their creditor rights;

- not to take dividends, distributions or other money from INI; and

- to consent, in the event of any further default, to the Nesrallahs' enforcement of their security interests "without delay or further notice."

29.   Before Dauplaise and Shinder signed the August Forbearance Agreement, they discussed by e-mail the

company's need to disclose the issue if it received a notice of default.

30. Dauplaise and Shinder received and signed the August Forbearance Agreement.

31. Dauplaise understood that the Nesrallahs claimed in the August Forbearance Agreement that Bio One was in default. Dauplaise also understood that his signature acknowledged that Bio One was in default.

32. On August 18, 2004, Bio One filed its Form 10-QSB covering the period to June 30, 2004 (the "Second Quarter 10-Q"). Dauplaise, Shinder and the other Bio One directors reviewed and approved the Second Quarter 10-Q. Dauplaise signed the filing as both the chief executive officer and chief financial/accounting officer.

33. The Second Quarter 10-Q describes the $15 million (Canadian) promissory note and Bio One's obligation to pay 57 monthly installments starting on July 1, 2004. However, it fails to disclose the July 1, 2004 non-payment or the August Forbearance Agreement. Dauplaise has claimed that the failure to mention the August Forbearance Agreement was an "oversight."

34. On or about November 1, 2004, Pam Nesrallah sent a second forbearance agreement (the "November Forbearance Agreement") to Dauplaise. The November Forbearance Agreement included the same restrictions as the August

Forbearance Agreement, and Nesrallah attached three even-
more explicit documents:

- a two-page "Notice of Default" that says, in
  part, "the creditor desires to give notice to the
  Corporation of such Default in Payment;"

- a one-page "Notice of Intention to Enforce
  Security" that outlines the debt and says that
  Nesracorp "intends to enforce its security on
  [INI's] property;"

- a one-page "Acknowledgement & Waiver" for
  Dauplaise and Shinder to sign in that
  acknowledged receipt of the notices, waived
  further notice and consented to the immediate
  enforcement of the Nesrallah's security.

35.   Dauplaise and Shinder signed the November
Forbearance Agreement and signed the Acknowledgement &
Waiver.

36.   Neither Dauplaise nor Shinder consulted with an
attorney before signing the forbearance agreements.
Shinder knew when he signed the Acknowledgement & Waiver
that he was waiving the notice period in the event of a
default.

37.   On November 15, 2004, Bio One filed its Form 10-
QSB covering the period to September 30, 2004 (the "Third
Quarter 10-Q").  Dauplaise signed the filing as both the

chief executive office and chief financial/accounting officer.

38.    The Third Quarter 10-Q included unaudited financial statements prepared by the Bio One's accountants, who relied on a management representation letter signed by Dauplaise.  In that October 25, 2004 letter, Dauplaise wrote that "The Company has complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance."

39.    In fact, Bio One had not complied with all aspects of the $15 million (Canadian) promissory note. That note would have a material effect on the financial statements in the event of noncompliance.

40.    The Third Quarter 10-Q describes the note and the monthly payments, but it fails to mention the non-payment or either forbearance agreement.

41.    The Second Quarter 10-Q and the Third Quarter 10-Q each included two certifications entitled "Officer's Certification Pursuant to Section 302" that were signed by Dauplaise.  Each certification stated, in part, that:

> - "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were

made, not misleading with respect to the period
covered by this report;" and

- "Based on my knowledge, the financial statements,
  and other financial information included in this
  report, fairly present in all material respects
  the financial condition, results of operations
  and cash flows of the small business issuer as
  of, and for, the periods presented in this
  report[.]"

42. When Dauplaise signed the certifications, they
were false.

### D.   THE NESRALLAHS APPOINT A RECEIVER TO SEIZE INI'S ASSETS, BUT DAUPLAISE, AND SHINDER CONCEAL, FACTS FROM BIO ONE'S LAWYERS AND ACCOUNTANTS

43. On December 13, 2004, the Nesrallah family
appointed a receiver to seize INI's assets.  The receiver
changed INI's locks and seized its bank accounts.  The
receiver retained the Nesrallahs to run the company.  As a
result, Bio One lost control of INI's assets.  According to
Shinder, "this [was] a major, major issue."  Shinder has
admitted under oath that the appointment of the receiver
was a material event that should have been disclosed.

44. Dauplaise and Shinder learned about the
appointment of the receiver on or about December 13, 2004.
They did not tell the board of directors or Bio One's

attorneys at the law firm of Kirkpatrick & Lockhart about the receivership until after December 23, 2004.

45.   On December 23, 2004, Bio One filed a Form 8-K attaching 2002 and 2003 financial statements for INI.  The Form 8-K failed to disclose the default, forbearance agreements or receivership.

46.   The statements filed with the Form 8-K and drafted by Bio One's accountants included a "Subsequent Events" note that disclosed Bio One's purchase of INI and said that: "In December 2004 the purchaser [Bio One] was delinquent in their obligation" to INI's former owner, Nesracorp."

47.   The filing used the term "delinquent" rather than "default" because Dauplaise and Shinder withheld facts from Bio One's lawyers and accountant.

48.   On December 21, 2004, Bio One's accountant Thomas Tschopp sent draft financial statements to a Kirkpatrick & Lockhart attorney with a subsequent events footnote that said: "In December 2004 the purchaser was declared in default of their obligation under the purchase agreement and the parties are renegotiating the payment terms."

49.   On December 22, 2004, the attorney circulated two Form 8-Ks:  the first attaching the financial statements and the second disclosing the default pursuant to Item 2.04.

50.   Initially, Dauplaise and Shinder approved the disclosure of a "default."   Dauplaise signed the first Form 8-K with Tschopp's subsequent event note.   Shinder wrote a revision to the second Form 8-K that included the language: "Bio One entered into a Forbearance Agreement under the terms of which *Bio-One acknowledged that it was in default* of making certain payments under the Note[.]" (emphasis added)   Shinder e-mailed his revision to Dauplaise and the attorney.

51.   Within hours of receiving Shinder's e-mail, several Kirkpatrick & Lockhart attorneys held a conference call with Shinder and Dauplaise to discuss the INI situation.   The attorneys had not seen the forbearance agreements.   Neither Shinder nor Dauplaise mentioned the receiver to the lawyers.   The attorneys knew that Bio One had not made the July 1, 2004 payment, but Shinder told the attorneys that the company had never received a written notice of default and that the forbearance agreements had been oral, not written.   Shinder's statement was false.   In the absence of full and accurate disclose by Dauplaise and Shinder, the lawyers agreed that the situation described by Shinder and Dauplaise could be described as "delinquent."

52.   After the conference call with Bio One's attorneys, Shinder and Dauplaise spoke by telephone with Bio One's accountant, Tom Tschopp.   Dauplaise did most of the speaking.   Dauplaise objected to the term "default" and

said that "it was not a technical default." Dauplaise did not mention either forbearance agreement, and Tschopp did not learn about them until February 2005. Dauplaise downplayed the significance of the receiver. Tschopp agreed to replace the term "default" with "delinquent."

53. Tschopp understood that "delinquent" was less serious than "default" and implied an informality to the situation. He relied on Dauplaise's representation and on Shinder's failure to contradict Dauplaise. As a result, the first Form 8-K did not disclose Bio One's default when the company filed it on December 23, 2004. The second Form 8-K was never filed.

54. Hours after the Form 8-K was filed on December 23, 2004, Pam Nesrallah sent an e-mail to Dauplaise saying that the Nesrallahs did not want to work with Bio One in the future. Dauplaise forwarded the e-mail to Shinder. Shinder responded with an e-mail that said, in part, "On the corporate governance side we must now brief the Board."

E.    **BIO ONE FAILED TO DEVISE OR MAINTAIN A SYSTEM OF INTERNAL ACCOUNTING CONTROLS**

55. Bio One failed to devise or maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's general and specific authorization.

56.   Bio One had no system of controls to confirm the financial reports provided by its subsidiaries.  For example, Bio One had no system of controls to confirm the financial reports provided by Shengtai, including whether the subsidiary's reports were prepared in accordance with US GAAP or properly reported the subsidiary's transactions.

57.   Yet Bio One incorporated the subsidiaries' reports, including reports from Shengtai, into financial statements filed with the Commission.

**F.    BIO ONE FIRED DAUPLAISE AND SHINDER, BUT NEVER FILED A FILED A POST-EFFECTIVE AMENDMENT OR AMENDED PROPECTUS**

58.   The forbearance agreements and the receiver were first disclosed to the public in a Form 8-K filed on February 15, 2005.

59.   On February 18, 2005, Bio-One terminated Dauplaise's employment and severed all relationships with Shinder.

60.   Bio One never filed a post-effective amendment to the May 6, 2004 registration statement or an amended prospectus.

61.   Bio One has not filed its Form 10-KSB for the year ended December 31, 2004 or its Form 10-QSB for the quarter ended March 31, 2005, and the company has informed the SEC that it will not able to do so.

62.   Upon information and belief, Bio One has ceased business operations, and all but one member of the board of directors have resigned.

## FIRST CLAIM FOR RELIEF

### (Violations of the Fraud Provisions of the Securities Act and the Exchange Act)

63.   Plaintiff SEC hereby incorporates ¶¶ 1 through 62 with the same force and effect as if set out here.

64.   In the manner described above, defendants Dauplaise and Shinder, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, directly or indirectly (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon persons.

65.   By reason of the foregoing, defendant Dauplaise violated Section 17(a) of the Securities Act of 1933 ("Exchange Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder, and unless restrained will continue

to violate, or continue to aid and abet the violation of those sections.

66.   Defendant Shinder violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder, or aided and abetted the violation of Section 10(b) and Rule 10b-5, and unless restrained will continue to violate, or continue to aid and abet the violation of those sections.

## SECOND CLAIM FOR RELIEF

### (Violations of the Reporting Provisions of the Exchange Act)

67.   Plaintiff SEC hereby incorporates ¶¶ 1 through 66 with the same force and effect as if set out here.

68.   Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-11 and 13-a13 promulgated thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1] require every issuer of a registered security to file current and quarterly reports with the SEC that accurately reflect the issuer's financial performance and provide other true and accurate information to the public.  Rule 13a-14 promulgated thereunder [17 C.F.R. 240.13a-14] requires that the principal executive and principal financial officers sign a certification on Form 10-QSB.

69.   In the manner described above, defendants Dauplaise and Shinder aided and abetted violations of

Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-11 and 13a-13 promulgated thereunder [17 C.F.R. §§ 240.13a-11, 240.13a-13], and unless restrained will continue to aid and abet violations of those sections.

70.   Defendant Dauplaise violated Rule 13a-14 promulgated under the Exchange Act [17 C.F.R. § 240.13a-11], and unless restrained will continue to violate those sections.

### THIRD CLAIM FOR RELIEF

**(Violations of the Books and Records
provisions of the Exchange Act)**

71.   Plaintiff SEC hereby incorporates ¶¶ 1 through 70 with the same force and effect as if set out here.

72.   In the manner described above, defendants Dauplaise and Shinder, directly or indirectly, falsified or caused the falsification of, the books, records or accounts of Bio One.

73.   Defendants Dauplaise and Shinder violated, and unless restrained will continue to violate, Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1].

### FOURTH CLAIM FOR RELIEF

**(Violations of the Lying to Accountants
provisions of the Exchange Act)**

74.   Plaintiff SEC hereby incorporates ¶¶ 1 through 73 with the same force and effect as if set out here.

75.   In the manner described above, defendants Dauplaise and Shinder, directly or indirectly, (a) made or caused to be made a materially false or misleading statement, or (b) omitted to state, or caused another person to omit to state, a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to an accountant in connection with an audit or examination of the financial statements of Bio One.

76.   Defendants Dauplaise and Shinder violated or aided and abetted violations of, Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2], and unless restrained will continue to violate or continue to aid and abet violations of this rule.

## FIFTH CLAIM FOR RELIEF

### (Violations of the Internal Controls provisions of the Exchange Act)

77.   Plaintiff SEC hereby incorporates ¶¶ 1 through 76 with the same force and effect as if set out here.

78.   Section 13(b)(2)(B) of the Exchange Act requires in relevant part that public companies, "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are executed in accordance with management's general and specific authorization."

79.   Bio One failed to devise or maintain the required system of internal accounting controls.

80.   Defendants Dauplaise and Shinder aided and abetted violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], and unless restrained will continue to violate or continue to aid and abet violations of this rule.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter a judgment:

(a)   permanently enjoining defendant Dauplaise, and his agents, servants, employees, attorneys, and those in active concert or participation with them, who receive actual notice by personal service or otherwise, from (i) violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; (ii) violating Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder; (iii) violating Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-11, 13a-13, and Rule 13a-14  promulgated thereunder [17 C.F.R. § 240.12b-20, 240.13a-11, 240.13a-13 and 240.13a-14]; (iv) violating Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1]; (v) violating Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2]; and (vi) violating Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

(b)   permanently enjoining defendant Shinder, and his agents, servants, employees, attorneys, and those in active concert or participation with them, who receive actual notice by personal service or otherwise, from (i) violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; (ii) violating Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder; (iii) violating Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-11 and 13a-13 promulgated thereunder [17 C.F.R. § 240.12b-20, 240.13a-11, and 240.13a-13]; (iv) violating Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1]; (v) violating Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2]; and (vi) violating Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

(c)   ordering defendants Dauplaise and Shinder to pay civil money penalties pursuant to Section 24 of the Securities Act [15 U.S.C. § 77x] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(d)   permanently barring defendants Dauplaise and Shinder from serving as an officer or director of a publicly traded company pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and

(e)   granting such other relief as this Court may deem just and appropriate.

## JURY TRIAL DEMAND

The SEC hereby demands a jury trial.


Dated: September 21, 2005

_Russell D. Duncan_

Peter H. Bresnan
Russell D. Duncan, Trial Counsel
Cheryl J. Scarboro
Brent Mitchell

Attorneys for Plaintiff
Securities and Exchange
   Commission
100 F Street NE
Washington, D.C. 20549-4631
(tel) 202/551-4904 (Duncan)
(fax) 202/772-9233 (Duncan)